No. 25-1146

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

FAYETTEVILLE PUBLIC LIBRARY,
a political subdivision in the City of Fayetteville, *et al.*,

*Plaintiffs-Appellees*,

HAYDEN KIRBY,

*Plaintiff*,

LETA CAPLINGER, *et al.*,

*Plaintiffs-Appellees*

v.

CRAWFORD COUNTY, ARKANSAS, *et al.*,

*Defendants*,

TODD MURRAY, each in his or her official capacity as a prosecuting
attorney for the State of Arkansas, *et al.*,

*Defendants-Appellants*,

TIM GRIFFIN, in his official capacity as Attorney General of Arkansas,

*Intervenor-Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Western District of Arkansas
No. 5:23-cv-05086 (Hon. J. Timothy L. Brooks)

---

## PLAINTIFFS-APPELLEES' BRIEF

---

David M. Fuqua
John T. Adams
Attorneys for Central Arkansas Library System, Nate Coulter, and the Eureka Springs Carnegie Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
(501) 374-0200
dfuqua@fc-lawyers.com
jadams@fc-lawyers.com

Bettina Brownstein
BETTINA E. BROWNSTEIN LAW FIRM
John C. Williams
ARK. CIVIL LIBERTIES UNION FDN.
Attorneys for Leta Caplinger, Olivia Farrell, Miel Partain, and Madeline Partain
904 West 2nd Street, Suite 2
Little Rock, AR 72201
(501) 920-1764
bettinabrownstein@gmail.com
john@acluarkansas.org
On Behalf of the Arkansas Civil Liberties Union Foundation, Inc.

Vincent O. Chadick
Brandon B. Cate
Glenn V. Larkin
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
bcate@qgtlaw.com
vchadick@qgtlaw.com
glarkin@qgtlaw.com

Rebecca Hughes Parker
Harrison Rosenthal
Attorneys for Pearl's Books, LLC, Wordsworth Community Bookstore LLC, American Booksellers Association, Association of American Publishers, Inc., Authors Guild, Inc. Comic Book Legal Defense Fund, and Freedom to Read Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
rebeccahughes.parker@dentons.com
harrison.rosenthal@dentons.com

Victoria S. Nugent
Jeff B. Dubner
Orlando Economos
Will Bardwell
Aman George
Attorneys for the Arkansas Library Association, Advocates for All Arkansas Libraries, and Adam Webb, in his individual capacity
DEMOCRACY FORWARD FDN.
P.O. Box 34554
Washington, DC 20043
(202) 448-9090
vnugent@democracyforward.org
oeconomos@democracyforward.org
wbardwell@democracyforward.org
ageorge@democracyforward.org

## SUMMARY OF THE CASE

In 2023, Arkansas enacted Act 372, which has two relevant provisions. Section 1 imposes criminal penalties on booksellers, librarians, or even parents who "make[] available" to a minor of any age a book that would be obscene as to the youngest minors. Section 5 authorizes local governments to withdraw books from local libraries based on their "appropriateness," a term undefined in statute. The district court granted summary judgment to Plaintiffs, holding that both sections violate the First and Fourteenth Amendments: Section 1 is overbroad and vague, and Section 5 is vague and discriminates on the basis of content. It enjoined Defendants from enforcing either section. The district court's ruling should be affirmed.

Given the number of issues and their importance, Plaintiffs-Appellees concur with Defendants-Appellants and respectfully request 20 minutes for oral argument.

# RULE 26.1 STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellees Pearl's Books, LLC, Wordsworth Community Bookstore LLC, American Booksellers Association, Association of American Publishers, Inc., Authors Guild, Inc., Comic Book Legal Defense Fund, and Freedom to Read Foundation state that they have no parent corporation and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

SUMMARY OF THE CASE .................................................................. iv

RULE 26.1 STATEMENT ..................................................................... v

TABLE OF AUTHORITIES ............................................................... viii

STATEMENT OF ISSUES ..................................................................... 2

INTRODUCTION ................................................................................... 4

STATEMENT OF THE CASE .............................................................. 6

SUMMARY OF ARGUMENT ............................................................ 13

ARGUMENT ......................................................................................... 16

I.     STANDARD OF REVIEW ........................................................ 16

II.    PLAINTIFFS HAVE STANDING, AND THEIR CLAIMS ARE
       RIPE ............................................................................................ 16

       A. Plaintiffs have standing to bring their Section 1 claims, and
          those claims are ripe. ........................................................... 18

       B. Plaintiffs have standing to bring their Section 5 claims, and
          those claims are ripe. ........................................................... 23

III.   SECTION 1 IS FACIALLY UNCONSTITUTIONAL .................... 26

       A. Section 1 Is Overbroad ......................................................... 27

          1. Rational-basis review is not the correct standard ............... 27

          2. Section 1 is overbroad ...................................................... 30

       B. Section 1 Is Unconstitutionally Vague .................................. 41

IV.    THE CHALLENGE PROVISION IS UNCONSTITUTIONAL ..... 44

A. The District Court Correctly Held That the Challenge Provision Violates the First and Fourteenth Amendments ...................... 45

    1. The Challenge Provision is unconstitutionally vague .......... 45

    2. The Challenge Provision enables unlawful content-based restrictions ............................................................................ 50

    3. The Challenge Provision discriminates on the basis of viewpoint and is a prior restraint. ....................................... 53

B. Library Collection Decisions Are Not Government Speech ...... 54

    1. Eighth Circuit and Supreme Court opinions show that library collection decisions are not government speech. .................. 55

    2. Section 5's removal regime is not government speech under Shurtleff. ................................................................................ 58

V.      THE INJUNCTION WAS NOT AN ABUSE OF DISCRETION .. 66

CONCLUSION ........................................................................................ 68

CERTIFICATE OF SERVICE ............................................................... 71

CERTIFICATE OF COMPLIANCE ...................................................... 72

# TABLE OF AUTHORITIES

## Cases

*All. for Open Soc'y Int'l, Inc. v. USAID*, 430 F. Supp. 2d 222 (S.D.N.Y. 2006) .................................................................. 62

*Am. Booksellers Ass'n, Inc. v. Virginia*, 494 U.S. 1056 (1990) .............. 31

*Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125 (4th Cir. 1989) ... 31

*Am. Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990) ..................... 31

*Ashcroft v. ACLU*, 542 U.S. 656 (2004)................................................ 28

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 243 (2002) ....................... 40

*Babbitt v. Sweet Home Chapter of Comtys. for a Great Or.*, 515 U.S. 687 (1995) ..................................................................... 34

*Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236 (1968) ...... 21

*Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217 (2000) ............................................................................ 65

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) ........................................................ 56-57

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000).................................... 28

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786 (2011)................................ 28

*Butler v. Michigan*, 352 U.S. 380 (1957)......................................... 4, 33

*City of Chicago v. Morales*, 527 U.S. 41 (1999)..................................... 43

*City of Hugo v. Nichols*, 656 F.3d 1251 (10th Cir. 2011) ....................... 22

*Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996 (W.D. Ark. 2003)..... .................................................................................. 20, 24, 32

*Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022)......... 2, 17, 19

*Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 (Tenn. 1993) .............................................................................. 31

*Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015) .................................................................... 20, 24

*Duhe v. City of Little Rock*, 902 F.3d 858 (8th Cir. 2018)...................... 42

*Erznoznik v. Jacksonville*, 422 U.S. 205 (1975)................................ 28, 51

*Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318 (8th Cir. 2014). 16, 25

*Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025) ................... 2, 5

*Freedman v. State of Maryland*, 380 U.S. 51, 55 (1965) ........................ 54

*FTC v. Am. Screening, LLC*, 105 F.4th 1098 (8th Cir. 2024) ............. 3, 66

*Ginsberg v. New York*, 390 U.S. 629 (1968) ....................................... 6, 36

*GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024) .................................. 2, 5, 15, 44, 54-56, 58, 61, 63, 65-66

*Hill v. Colorado*, 530 U.S. 703 (2000) ..................................................... 42

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ........................... 17

*Horne v. Flores*, 557 U.S. 433 (2009) ....................................................... 17

*Interactive Dig. Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954 (8th Cir. 2003) ............................................................................................ 4

*Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968) .......... 41, 48

*Jacobsen v. Howard*, 109 F.3d 1268 (8th Cir. 1997) .............................. 30

*Johnson v. United States*, 576 U.S. 591 (2015) ................................. 42-43

*Koehler v. Brody*, 483 F.3d 590 (8th Cir. 2007) ..................................... 29

*L.H. v. Indep. Sch. Dist.,* 111 F.4th 886, 888 (8th Cir. 2024) ................. 24

*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025) ........... 57-58, 64, 66

*Loughrin v. United States*, 573 U.S. 351 (2014) ..................................... 45

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..................................... 16

*M.S. News Co. v. Casado*, 721 F.2d 1281 (10th Cir. 1983) .................... 38

*Matal v. Tam*, 582 U.S. 218 (2017) ................................................... 55, 63

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ..................................... 38

*N. Bottling Co. v. PepsiCo, Inc.*, 5 F.4th 917 (8th Cir. 2021) ................. 51

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) ............................................................................................ 45

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ........................ 16

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) ........................ 29

*Redner v. Dean*, 29 F.3d 1495 (11th Cir. 1994) ..................................... 57

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .........................................50

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) .............................................67

*Reno v. ACLU*, 521 U.S. 844 (1997) ...............................................29, 42

*Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979)...............................22

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ..53

*Shipley v. Long*, 454 F. Supp. 2d 819 (E.D. Ark. 2004) .........31-32, 36, 38

*Shipley, Inc. v. Long*, 195 S.W.3d 911 (Ark. 2004) ..................................
........................................................2, 5-6, 14, 27, 32-34, 36, 42

*Shurtleff v. Boston*, 596 U.S. 243 (2022) ...........2, 55, 58-59, 61-62, 64, 66

State Defs.' Resistance to Pls. Renewed Mot. for Prelim. Inj., *Iowa Safe
    Schs. v. Reynolds*, No. 4:23-cv-474 (S.D. Iowa Dec. 3, 2024), ECF
    No. 128 ....................................................................................56

*Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997)
    ........................................................................2, 41-42, 45, 47, 49

*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012) .................46

*Transcontinental Ins. Co. v. W.G. Samuels Co.*, 370 F.3d 755 (8th Cir.
    2004) ...........................................................................................53

*Troxel v. Granville*, 530 U.S. 57 (2000)...................................................36

*Trump v. New York*, 592 U.S. 125 (2020) ...............................................17

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)...........................50

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)......................29-30

*U.S. Term Limits, Inc. v. Hill*, 872 S.W.2d 349 (Ark. 1994)...................67

*United States v. Am. Libr. Ass'n*, 539 U.S. 194 (2003) ..........................62

*United States v. Bean*, 537 U.S. 71 (2002) ..............................................35

*United States v. Hansen*, 599 U.S. 762 (2023) .......................................39

*United States v. Kaylor*, 877 F.2d 658 (8th Cir. 1989) ..........................42

*United States v. Stevens*, 559 U.S. 460 (2010) .......................................27

*Upper Midwest Booksellers Association v. City of Minneapolis*, 780 F.2d
    1389 (8th Cir. 1985) ................................................................37-38

*Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir. 1992).50

*Virden v. Crawford Cnty.,* No. 2:23-cv-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024) ....................................................................12, 24-26

*Virginia v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618 (Va. 1988) .......31

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)... .................
.................................................................................... 2, 17, 19, 30

*Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025) ...................................57

*Warner Bros. Entmt., Inc. v. X One X Prods.*, 840 F.3d 971 (8th Cir. 2016) ......................................................................................3, 67

*Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982).................22

*Young v. Am. Mini Theatres*, 427 U.S. 50 (1976)...................................37

## Statutes and Rules

Ark. Code Ann. § 13-2-106 ........................................ 2, 4, 7, 12, 52-54, 67

Ark. Code Ann. § 5-2-202 .......................................................................36

Ark. Code Ann. § 5-27-212 ...................................... 2, 4, 6, 27, 33, 39, 45

Ark. Code Ann. § 5-68-501 ...............................................................6, 33

Ark. Code Ann. § 5-68-502 ........................................ 5, 33, 35-36, 40, 43

## Other Authorities

*Appropriate*, The American Heritage Dictionary (New College Ed. 1976) .......................................................................46

*Show*, MerriamWebster.com, Merriam-webster.com/dictionary/show (last visited Sep. 19, 2025) ...............................................................................................34

## STATEMENT OF ISSUES

1.  Whether the district court correctly held that at least one Plaintiff established standing and ripeness for each claim.

Apposite Authority: *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988); *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022).

2.  Whether the district court correctly held that Section 1 violates the First Amendment and Due Process Clause because it is vague and overbroad.

Apposite Authority: *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291 (2025); *Virginia*, 484 U.S. 383; *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303 (8th Cir. 1997); *Shipley, Inc. v. Long*, 195 S.W.3d 911 (Ark. 2004); Ark. Code Ann. § 5-27-212.

3.  Whether the district court correctly held that Section 5 violates the First Amendment and Due Process Clause because it is vague and imposes content-based restrictions.

Apposite Authority: *Shurtleff v. Boston*, 596 U.S. 243 (2022); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660 (8th Cir. 2024); *Stephenson*, 110 F.3d 1303; Ark. Code Ann. § 13-2-106.

4.   Whether the district court abused its discretion by enjoining Defendants-Appellants from enforcing Section 1 or implementing Section 5.

Apposite Authority: *FTC v. Am. Screening, LLC*, 105 F.4th 1098, 1105 (8th Cir. 2024); *Warner Bros. Entmt., Inc. v. X One X Prods.*, 840 F.3d 971, 981 (8th Cir. 2016).

**INTRODUCTION**

The government does not have "an unbridled license … to regulate what minors read and view." *Interactive Dig. Software Ass'n v. St. Louis Cnty. Mo.*, 329 F.3d 954, 959-60 (8th Cir. 2003). States may not "reduce the adult population … to reading only what is fit for children" when regulating access to reading materials. *Butler v. Michigan*, 352 U.S. 380, 383 (1957).

Applying those principles, the district court enjoined two provisions of Arkansas's Act 372 that interfere with adults and older minors' ability to read constitutionally protected books and enable viewpoint-based censorship. Section 1 imposed criminal penalties on booksellers, librarians, and even parents who "ma[de] available" to a minor of any age a book that is obscene for the youngest minors. Ark. Code Ann. § 5-27-212(b)(1). Section 5 authorized local governments to withdraw any book from a public library based on its "appropriateness," a vague term nowhere defined in statute. Ark. Code Ann. § 13-2-106(c)(8). The district court correctly enjoined both sections under the First and Fourteenth Amendments.

Defendants largely do not dispute that the district court's interpretation of the statute fails First Amendment scrutiny. Instead,

they offer implausible constructions that the Arkansas Supreme Court has rejected, *see Shipley, Inc. v. Long* ("*Shipley II*"), 195 S.W. 3d 911 (Ark. 2004), or that Defendants concede "appear nowhere in the text of the law," Suppl. App. 39, R. Doc. 53, at 39. They ignore adverse factual findings about the harm that Plaintiffs face and the burdens the statute will force booksellers and librarians to endure. And they seek to exempt Section 5 from the First Amendment altogether, based on a government speech argument that this Court rejected last year. *See GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 667-68 (8th Cir. 2024). None of their arguments warrant reversal.

This case is not about whether states may prohibit the provision of obscene speech to minors; Arkansas already has a narrowly tailored statute that does that. *See* Ark. Code Ann. § 5-68-502. This is about whether the government may "use ostensibly legitimate purposes to disguise efforts to suppress fundamental rights." *Free Speech Coal., Inc.*, 145 S. Ct. at 2316. A state cannot criminalize making books available to a 17-year-old because they might be obscene for the youngest minors. It cannot prohibit parents from choosing what books to give their child. And

it cannot impede access to books because it dislikes their viewpoint. To protect our freedom of speech, this Court should affirm.

## STATEMENT OF THE CASE

The district court found two provisions of Act 372 unconstitutional. Section 1 required bookstores and public libraries to restrict adult access to books that are obscene as to the youngest minors or else risk criminal penalties for their employees and librarians. It creates a misdemeanor offense if a person, "knowing the character of the item involved, … knowingly … [f]urnishes, presents, provides, makes available, gives, lends, shows, advertises, or distributes to a minor an item that is harmful to minors." Ark. Code Ann. § 5-27-212(b)(1). Items harmful to minors are materials that are obscene to minors under the state's variable obscenity statute, Ark. Code Ann. § 5-68-501,[1] which the Arkansas Supreme Court has interpreted to include "materials that would arguably be 'harmful' to [younger minors], even though not 'harmful' to an older child." *Shipley II*, 195 S.W.3d at 917.

Section 5 enabled content and viewpoint discrimination by allowing government bodies to remove materials based on "appropriateness." *See*

---

[1] The definition of harmful to minors tracks the definition used by the Supreme Court in *Ginsberg v. New York*, 390 U.S. 629, 641-43 (1968).

Ark. Code Ann. § 13-2-106. Section 5 authorizes any "person affected by" any library material to "challenge the appropriateness" of that material. Ark. Code. Ann. § 13-2-106(c)(1). It does not define "appropriateness," nor does it require that the challenger be a patron of the library or reside in Arkansas. *See* Add. 23; App. 1120; R. Doc. 126, at 23. The library's review committee is directed to "determine if the material being challenged meets the criteria of selection," and instructed that material cannot be "withdrawn *solely* for the viewpoints expressed within the material." Ark. Code. Ann. § 13-2-106(c)(7) (emphasis added). The statute does not, however, prohibit consideration of the viewpoints expressed. The committee then votes whether to "relocate[]" the material "to an area that is not accessible to minors under the age of eighteen (18) years." *Id.* § 13-2-106(c)(11)(A). Section 5 does not say what makes an area "not accessible to minors," nor does it explain the difference between "relocation" and "withdraw[al]."

If the committee determines not to withdraw or relocate the book, the challenger can appeal to the city or county's governing body, which must review the appeal within 30 days. *Id.* § 13-2-106(c)(12). The governing body must be provided the material being challenged, the

challenger's request, the review committee's decision, and a summary thereof; but it need not be provided with the library's selection criteria, and it need not review the material at all. *Id.* There is no appeal process when a library withdraws or relocates a book.

To comply with Section 1 and avoid the risk of criminal prosecution, librarians and booksellers face untenable choices: ban all minor patrons, undertake expensive renovations to create "adults-only" sections, or remove books from shelves. *See* Add. 20; App. 1117; R. Doc. 126, at 20. Adults and older minors would lose access to constitutionally protected material*, see id.*, because many bookstores and libraries cannot undertake the needed renovations, *see infra* at 16, 26. Restricting titles for sale or library lending would deprive authors and publishers of readers and a market for their work. *See* App. 537, R. Doc. 99-14 at ¶¶ 5-7; App. 540, R. Doc. 99-15 at ¶¶ 3-5. Meanwhile, by enabling governing bodies to remove books deemed "inappropriate" by an indeterminate standard, Section 5 threatens similar harms. *See* Add. 25-31; App. 1122-28; R. Doc. 126, at 25-31.

In June 2023, a coalition of booksellers, librarians, libraries, library patrons, and professional associations sued to enjoin enforcement of Sections 1 and 5.

On July 29, 2023, before Act 372 went into effect, the district court issued a preliminary injunction. Suppl. App. 49, R. Doc. 53. Defendants did not appeal.

On December 23, 2024, the district court granted Plaintiffs summary judgment and enjoined enforcement of Sections 1 and 5. Add. 1; App. 1098; R. Doc. 126. For Section 1, the court found that Plaintiffs had standing to sue the prosecutors to redress the First Amendment injury posed by the threat of prosecution for "furnishing a harmful item to a minor" because Section 1 "subject[s] the librarian and bookstore Plaintiffs to a credible fear of prosecution." Add. 10; App. 1107; R. Doc. 126, at 10. This threat affected the patron Plaintiffs' First Amendment rights by "burden[ing] older minors' and adults' access to books that contain even a modicum of sexual content." Add. 12; App. 1109; R. Doc. 126, at 12.

On the merits, the court found Section 1 unconstitutional on its face for two reasons. First, Section 1 is overbroad. Because it exposes

booksellers and librarians to criminal penalties if they "make available" to older minors books that are obscene only as to the youngest minors, "librarians and booksellers must impose restrictions on older minors' and adults' access to vast amounts of reading material." Add. 20; App. 1117; R. Doc. 126, at 20. Therefore, "it is likely they [librarians] will shelve only books fit for young children and segregate or discard the rest." Add. 21; App. 1118; R. Doc. 126, at 21. This violates the First Amendment rights of adults and older minors: "Creating segregated '18 or older' spaces in libraries and bookstores will powerfully stigmatize the materials placed therein, thus chilling adult access to this speech." Add. 20; App. 1117; R. Doc. 126, at 20.

Second, the court found that the terms "present," "make available" and "show" leave librarians and booksellers "unsure about whether shelving books they know contain sexual content may subject them to criminal liability." Add. 22; App. 1119; R. Doc. 126, at 19. Section 1 "provides no clarity on what affirmative steps a bookseller or librarian must take to avoid a violation," short of removing all books containing sexual content or banning all minors from the premises. *Id.*; *see also* Suppl. App. 39, R. Doc. 53, at 39.

As to Section 5, the court found that Plaintiffs Leta Caplinger and Miel Partain—Crawford County library patrons—have standing against Crawford County and Judge Keith.[2] The court held that these Plaintiffs would be injured by restricting access to library materials, and that it was not speculative that Section 5 would cause such a restriction. Section 5 authorizes the Crawford County Defendants "to decide on any basis they choose whether a challenged work should be relocated to a segregated section of the library or eliminated from the collection entirely." Add. 29-30; App. 1126-1127; R. Doc. 126, at 29-30.

Plaintiffs provided evidence that Section 5 would "substantially increase the volume of challenges to library materials" and make it likelier that challenges would succeed by placing removal decisions "into the hands of local governing bodies" unbound by library selection criteria. Add. 28-30; App. 1125-27; R. Doc. 126, at 28-30. The risk was particularly likely in Crawford County, whose quorum court had "threatened 'to defund the Library if its director did not find a way to satisfy [challengers'] concerns about books' with LGBTQ themes" and had been

---

[2] The district court did not reach the standing of librarian and library Plaintiffs. *See* Add. 27-31, App. 1124-28; R. Doc. 126, at 27-31.

enjoined from an ongoing effort to segregate books on the basis of viewpoint. Add. 30; App. 1127; R. Doc. 126, at 30 (quoting *Virden v. Crawford Cnty.,* No. 2:23-cv-2071, 2024 WL 4360495, at *2 (W.D. Ark. Sept. 30, 2024)).

On the merits, the court identified two constitutional problems. First, Section 5 uses several unconstitutionally vague terms impinging on speech. Most troublingly, it uses the undefined standard "appropriate," rather than the defined variable obscenity standard. Ark. Code Ann. § 13-2-106(c)(1). "[A]ny book, even one written for an adult reader, could be deemed 'inappropriate' and subject to challenge under Section 5." Add. 31; App. 1128; R. Doc. 126, at 31. Even Defendant Keith admitted that he "did not know what 'appropriate' meant in the context of Section 5 but guessed it could mean 'different thing[s] for different people.'" Add. 32; App. 1129; R. Doc. 126, at 32 (quoting App. 908; R. Doc. 99-23, at 48:1-10). The court found additional infirmity in Section 5's inconsistent use of "relocate" versus "withdraw," which provided unclear guidance about the degree to which a work should be restricted, and in its use of vague terms about accessibility to minors raising the same issues as Section 1. Add. 33; App. 1130; R. Doc. 126, at 33.

Second, the court found that Section 5 enables content-based restrictions because one cannot assess appropriateness without applying content-based or viewpoint-based judgments. Add. 33-35; App. 1130-32; R. Doc. 126, at 33-35. Section 5 could not pass strict scrutiny, as any content-based regulation must. Add. 34-35; App. 1131-32; R. Doc. 126, at 34-35. The court rejected Defendants' argument that removing books from library collections is government speech immune from First Amendment regulation. Add. 35; App. 1132; R. Doc. 126, at 35.

## SUMMARY OF ARGUMENT

**I.A.** Numerous Plaintiffs have standing to challenge Section 1. Defendants barely acknowledge the bookseller and librarian Plaintiffs threatened with criminal liability, or the patron Plaintiffs whose access to protected speech is jeopardized. Instead, they attempt to pick off the library (not librarian) Plaintiffs and excuse individual Defendants from the case, arguments that are both incorrect and irrelevant.

**I.B.** Plaintiffs Leta Caplinger, Miel Partain, and M. Partain have standing to sue Crawford County and Crawford County Judge Chris Keith to enjoin application of Section 5. The district court found that these Defendants would likely use the statute to suppress disfavored

viewpoints if the statute is enforced. Defendants cannot show that that finding was clearly erroneous.

**II.A.** Section 1 is overbroad. Defendants claim that the appropriate standard for review is rational basis, but the Supreme Court rejected that argument in *Paxton*. Section 1 violates the First Amendment under strict scrutiny, the applicable standard, or even under intermediate scrutiny, because its unconstitutional sweep overwhelms any legitimate applications. Defendants do not dispute that Section 1 is unconstitutional as interpreted by the district court. Instead, they try reinterpreting the statute to avoid its obvious unconstitutionality. But the Arkansas Supreme Court held in an indistinguishable case that a statute limiting displays of books that are "harmful to minors" must be interpreted to extend to books that are "not 'harmful' to an older child." *Shipley II*, 195 S.W.3d at 917. And Section 1's criminalization of merely "mak[ing] available" proscribed books sweeps even broader than the statute in *Shipley II. Id.* at 918.

**II.B.** Section 1 is also void for vagueness. Defendants' own dictionary definitions for terms like "present," "show," and "make

available," highlight that the statute provides booksellers and librarians no clarity for avoiding liability.

**III.A.** Section 5 is similarly void for vagueness. The statute uses an undefined "appropriateness" standard and provides no clarity regarding how to make a book "inaccessible" to minors. Defendants propose an implausible definition of "appropriateness" that they concede "appear[s] nowhere in the text of the law." Suppl. App. 39, R. Doc. 53, at 39.

**III.B.** Section 5 also allows viewpoint discrimination by government officials. Alongside the malleable term "appropriateness" it provides that books may not be "withdrawn *solely* for the viewpoints expressed within the material." Ark. Code. Ann. § 13-2-106(c)(7) (emphasis added), thus authorizing local governments to withdraw material partly or principally for that reason. The Crawford County Defendants have already shown that they likely will use that authority to discriminate against books with disfavored viewpoints.

**III.C.** Defendants' principal argument in defense of Section 5 is not that it survives First Amendment scrutiny but that it is government speech exempt from the First Amendment. This Court rejected that argument in *GLBT Youth*, 114 F.4th at 667-68. Defendants make no

attempt to grapple with the Court's reasoning. Their argument for expanding the government speech doctrine is exactly what the Supreme Court has warned against: "a subterfuge for favoring certain private speakers over others based on viewpoint." *Pleasant Grove City v. Summum*, 555 U.S. 460, 473 (2009).

**IV.** Defendants failed to raise arguments about the scope of the injunction in the district court, and in any event, have not shown that the district court abused its discretion in declining to sever and rewrite the statute to cure its constitutional defects.

## ARGUMENT

### I. STANDARD OF REVIEW

On appeal of summary judgment, this Court reviews legal conclusions de novo and findings of fact for clear error, viewing the evidence in the light most favorable to the nonmoving party. *Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318, 322 (8th Cir. 2014).

### II. PLAINTIFFS HAVE STANDING, AND THEIR CLAIMS ARE RIPE

Plaintiffs must show an injury-in-fact that is fairly traceable to Defendants' actions and redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and internal quotations omitted). Where "threatened enforcement" of a law

"implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing," particularly with regards to "the doctrine's first element: injury-in-fact." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (cleaned up). In a case with multiple plaintiffs, only one plaintiff need satisfy standing requirements for each claim. *Horne v. Flores*, 557 U.S. 433, 446-47 (2009).

Plaintiffs' case must also be ripe. *See, e.g.*, *Trump v. New York*, 592 U.S. 125, 131 (2020). Where "[p]laintiffs seek preenforcement review of a criminal statute," they are not "required to await and undergo a criminal prosecution as the sole means of seeking relief." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 15 (2010) (internal quotation omitted); *see also, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("*Virginia II*").

Defendants largely do not dispute that at least some Plaintiffs have standing against Section 1, instead focusing on arguments not made below regarding individual Plaintiffs and Defendants. As to Section 5, they mainly argue that it is speculative to believe that Crawford County will continue to discriminate based on viewpoint. Both arguments are unpersuasive.

## A. Plaintiffs have standing to bring their Section 1 claims, and those claims are ripe.

Defendants do not seriously challenge librarians' or booksellers' standing to challenge Section 1. *See* Defendants-Appellants' Brief ("Defs.' Br.") at 26. Nor could they. The librarian and bookseller Plaintiffs demonstrated a reasonable fear that they, or their members or employees, would be prosecuted under Section 1 because they have materials that could be deemed "harmful" to younger minors in areas conceivably "available" to minors in their libraries and bookstores. Add. 10, App. 1107, R. Doc. 126, at 10 n.4; *see, e.g.*, App. 388-89, R. Doc. 99-2, at ¶¶ 9-10; App. 399, 0404, R. Doc. 99-4 at ¶¶ 9, 30; App. 523, R. Doc. 99-11 at ¶ 4; App. 552-55, R. Doc. 99-17 at ¶¶ 24-25, 36.

Undisputed evidence showed that these Plaintiffs' options for avoiding criminal liability—excluding all minors or segregating books into adults-only rooms—are logistically and financially untenable and contrary to the core purpose of bookstores and public libraries. Add. 20-21; App. 1117-18; R. Doc. 126 at 20-21; *see, e.g.*, App. 389-91, R. Doc. 99-2 at ¶ 11  (describing "untenable" compliance options); App. 659-60, R. Doc. 99-18 at ¶ 7(a)-(c) (same); App. 0550-52, 0555, R. Doc. 99-17 at ¶¶

17-19, 23, 39 (estimating cost of a new segregated space at $1,000,000 plus $50,000 for staff to monitor).

The Supreme Court held that booksellers in a similar predicament had standing in a pre-enforcement facial challenge based on the threat of prosecution they faced for displaying material within the scope of a "harmful to minors" statute. *Virginia II*, 484 U.S. at 387. Accordingly, the threat of prosecution under Section 1 is an injury-in-fact, particularly under the "lenient" threshold for standing in pre-enforcement challenges. *Dakotans for Health*, 52 F.4th at 386. For the same reason, Plaintiffs' pre-enforcement challenge to Section 1 is ripe. *See Virginia II*, 484 U.S. at 393.

Appellants similarly do not meaningfully dispute the standing of library patron and bookstore customer Plaintiffs. *See id.* at 392-93. The steps that librarians and booksellers must take to avoid criminal liability under Section 1 will result in segregation or removal of materials that are constitutionally protected for adults and older minors, including the patron Plaintiffs. Add. 20; App. 1117; R. Doc. 126, at 20. Segregating those materials will burden their ability to access those works, either directly or because they will be chilled from accessing materials that have

been stigmatized and identified as harmful to children. *See, e.g.*, App. 679, R. Doc. 99-19, at 66:24-67:3; App. 704-06, R. Doc. 99-20, at 33:8-20, 38:15-20, 42:7-43:21; App. 764, R. Doc. 99-21, at 49:22-50:15. This is a straightforward injury to the constitutional rights of Plaintiffs who are library patrons or bookstore customers. *See Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003) (impediments to access, even if "relatively small, constitute a sufficient allegation" of injury to establish standing).

Because Plaintiffs' injuries arise from threat of prosecution, they are caused by the Prosecutor Defendants responsible for implementing that criminal provision. Suppl. App. 58, R. Doc. 79, at ¶ 61 ("[T]he Prosecuting Attorneys admit that they will treat Act 372 as they do any other criminal law."). Such injury is "fairly traceable," and thus redressable, where "the named defendants … possess [the] authority to enforce the complained-of provision." *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015).

The most Defendants say about librarian, bookseller, and patron Plaintiffs is that "Plaintiffs have not identified any item that *they* believe is harmful to minors … or that they wish to read that would be subjected

to [Section 1]." Defs.' Br. at 26 (emphasis added). This is wrong. Plaintiffs have identified "hundreds of books displayed in their collections and inventories that are likely to subject librarians and booksellers to prosecution under Section 1." Add. 10 n.4; App. 1107; R. Doc. 126, at 10 n.4. And "Plaintiffs who are adult patrons and mature-teenager patrons of public libraries ... have provided undisputed testimony that they are interested in reading books that contain at least some sexual content, which, in the Arkansas Supreme Court's view, would qualify as material that is 'harmful' to younger, less mature minors." Add. 10 n.4; App. 1107; R. Doc. 126, at 10 n.4 (citing *Shipley*, 195 S.W.3d at 917).

Defendants argue that public libraries lack standing because they are political subdivisions, and their associations correspondingly lack standing. Defs.' Br. at 20-21, 62-64. But political subdivisions have standing to challenge state laws under the First Amendment where their members or employees face personal risk for refusing to comply with laws that they believe are unlawful. *See Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968) (school board had standing to

challenge statute where members' refusal to comply would likely result in expulsion and reduced funding).[3]

In any event, three association Plaintiffs (Arkansas Library Association, Advocates for All Arkansas Libraries, and Freedom to Read Foundation) represent numerous individual librarians around the state, not just libraries. App. 398, R. Doc. 99-4 at ¶ 7; App. 554, R. Doc. 99-17 at ¶ 35. They have members in every judicial district in Arkansas. App. 398, R. Doc. 99-4 at ¶ 7 & fn. 1; App. 554, R. Doc. 99-17 at ¶ 35 & fn. 7. Defendants have never argued that Association Plaintiffs lack standing as to their individual members. Nor have they challenged the standing of the other association plaintiffs: the American Booksellers Association, Association of American Publishers, and Authors Guild represent members who write, publish, and sell books throughout Arkansas. *See* App. 439; R. Doc. 99-8, at ¶ 2 App. 536-37; R. Doc. 99-14, at ¶¶ 2, 7; App. 539, R. Doc. 99-15, at ¶ 2; App. 439; R. Doc. 99-8, at ¶ 2;

---

[3] Because this argument is raised for the first time on appeal, it should be deemed waived—and unlike some jurisdictional issues, it can be waived. Courts have expressed "serious reason to doubt" whether the political subdivision doctrine is jurisdictional. *City of Hugo v. Nichols*, 656 F.3d 1251, 1255 n.4 (10th Cir. 2011); *accord Rogers v. Brockette*, 588 F.2d 1057, 1070 (5th Cir. 1979); *cf. Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982) (ruling for political subdivisions without considering the doctrine, suggesting that it is not jurisdictional).

App. 536-37; R. Doc. 99-14, at ¶¶ 2, 7. There is thus no basis to carve out individual Prosecutor Defendants.

## B. Plaintiffs have standing to bring their Section 5 claims, and those claims are ripe.

As with Plaintiffs' Section 1 challenge, the undisputed facts show that several patron Plaintiffs will likely be injured by Section 5, those injuries will be fairly traceable to the County Defendants, and a decision in Plaintiffs' favor would redress these injuries.[4]

Plaintiffs provided undisputed evidence showing that segregating books into adults-only spaces, as Section 5 will require of libraries, will burden patrons' (including Plaintiffs Leta Caplinger, Miel Partain, and M. Partain, all Crawford County library patrons) ability to use the public library and access materials of interest to them. For example, M. Partain testified that she will be burdened if her access to books is limited to only those suitable for very young library users. App. 704-06, R. Doc. 99-20 at 33:8-20, 38:15-20, 42:7-43:21. Crawford County already attempted to place books M. wanted to read in a segregated section, an action that was

---

[4] Plaintiffs also argued below that librarian and library plaintiffs have standing to challenge Section 5. *See* App. 86-90; R. Doc. 75, at ¶¶ 12-15, 21. The district court did not rule on that argument. If the Court concludes that patron Plaintiffs lack standing, it should remand to the district court to consider other Plaintiffs' standing.

enjoined in a separate lawsuit. App.673, R. Doc. 99-20 at 43:14-21; App. 1089, R. Doc. 99-30 at 1; *see Virden*, 2024 WL 4360495, at *5.

Adult library patron Plaintiffs described how their library access will be curtailed because they would feel uncomfortable browsing books segregated into a stigmatized adults-only area. App. 437-38, R. Doc. 99-7 at ¶¶ 4-5; App. 679, R. Doc. 99-19 at 66:24-67:3; App. 764, R. Doc. 99-21 at 49:23-50:15. Additionally, segregating books into adults-only areas will preclude adults visiting their local library with young children to freely browse and find selections for themselves. App. 438, R. Doc. 99-7 at ¶ 5; App. 764, R. Doc. 99-21 at 52:9-24.

These are injuries-in-fact. *See, e.g.*, *Counts*, 295 F. Supp. 2d at 999. And the injuries are traceable to Judge Keith and Crawford County, who will implement the Section 5 challenge process. *Digit. Recognition*, 803 F.3d at 958.

Appellants argue that Plaintiffs' injury "is even more attenuated than in *L.H.* [*v. Indep. Sch. Dist.*, 111 F.4th 886 (8th Cir. 2024)]." Defs.' Br. at 22. In *L.H.*, parents challenged a public-school policy allowing students or parents/guardians to challenge school library materials they found objectionable. *L.H.*, 111 F.4th at 888. Because the parents neither

"allege[d] that any book [was] currently temporarily removed as a result of the enforcement of the policy" nor "challeng[ed] any currently removed or restricted book," the Eighth Circuit found no sufficiently imminent enforcement of the policy to give the parents standing. *Id.* at 894-95.

But in Crawford County, local officials were already segregating books based on viewpoints deemed "inappropriate." *Virden*, 2024 WL 4360495, at *3. The Partains did not speculate about whether Crawford County would segregate some of the titles that they sought: Crawford County was already working to segregate some of those exact books and authors, plus others like them. App. 706, R. Doc. 99-20 at 43:14-21; App. 1089, R. Doc. 99-30 at 1. The Crawford County Attorney acknowledged that Section 5 would "require libraries to have a section inaccessible to minors," connecting it to Crawford County's ongoing efforts to segregate books they found inappropriate. App. 80-81, R. Doc. 2-2. Defendants cannot show that the district court's factual finding that Crawford County would apply Section 5 similarly is clearly erroneous. *See Fagnan*, 745 F.3d at 322.

Appellants argue that enjoining the Crawford County Defendants is unnecessary because "[t]he separate LGBT section has been ordered

dismantled" by a final judgment (which Crawford County did not appeal). Defs.' Br. at 25; *see Virden,* 2024 WL 4360495. Defendants miss the point: Crawford County's viewpoint-discriminatory social section, which they maintained for nearly two years, from before this suit's filing until after summary judgment briefing in this case was complete, demonstrates that they would likely "restrict minors' access to unpopular opinions" again if permitted by Section 5. *Virden*, 2024 WL 4360495, at *4.

## III.    SECTION 1 IS FACIALLY UNCONSTITUTIONAL

Section 1 criminalizes "mak[ing] available" to *any* minor books obscene *only* for the youngest minors. Courts uphold such statutes only if they are limited to material obscene for all minors and make clear what booksellers and librarians must do to avoid liability. Section 1 fails these requirements: it suppresses adults' and older minors' access to books constitutionally protected for them, and it provides no objective compliance standards. Thus, it is facially overbroad and unconstitutionally vague. Because it directly burdens access to protected speech, strict scrutiny applies—although it fails intermediate scrutiny too.

## A. Section 1 Is Overbroad

Section 1 imposes criminal penalties on anyone who knowingly "presents," "makes available," or "shows … to a minor an item that is harmful to minors." Ark. Code Ann. § 5-27-212(b)(1). It defines "harmful to minors" by incorporating Arkansas's variable-obscenity standard, which the Arkansas Supreme Court has interpreted to cover material that is harmful to *any* minor. *Shipley II*, 195 S.W.3d at 915. Thus, Section 1 prohibits "show[ing]" or "mak[ing] available" to any minor any book that is obscene for the youngest minors.

The district court correctly held this proscription fatally overbroad. It is an expressly content-based restriction on speech that is protected for adults and older minors; as such, it is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotations omitted).

### 1. *Rational-basis review is not the correct standard.*

Defendants assert that this content-based restriction receives rational-basis review because it is "aimed at protecting children from obscenity." Defs.' Br. 47. The Supreme Court's recent opinion in *Paxton* rejected this exact argument, which would allow legislatures to "use

ostensibly legitimate purposes to disguise efforts to suppress fundamental rights." 145 S. Ct. at 2316.

Instead, the applicable standard is strict scrutiny or, at minimum, intermediate scrutiny. Strict scrutiny is "applicable to direct invasions of First Amendment rights," *id.* at 2301, while laws having "'only an incidental effect on protected speech'" are "subject to intermediate scrutiny," *id.* at 2306 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000)).

Section 1 suppresses older minors' access to speech that is protected for them, so strict scrutiny is the proper standard. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) ("[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)).

It also "'suppresse[s] a large amount of speech that adults have a constitutional right to receive' and to share." *Paxton*, 145 S. Ct. at 2312 (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004)); *see also, e.g.*, *Ashcroft*, 542 U.S. at 666 (upholding injunction against "harmful to

minors" statute for not using the least restrictive means available); *Reno v. ACLU*, 521 U.S. 844, 879 (1997) (same); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir. 2004) (applying strict scrutiny to expansion of state's harmful-to-minors law). The evidence showed that given the prohibitive costs of adding segregated spaces, Section 1 would force many bookstores and libraries not to carry regulated books at all. *See, e.g.*, App. 395, R. Doc. 99-3 at ¶¶ 15-16; App. 524, R. Doc. 99-11 at ¶ 7(b); App. 528, R. Doc. 99-12 at ¶¶ at 12-13. That directly burdens, and even denies, adult access to speech, distinguishing Section 1 from the incidental burden on adults of online age-verification in *Paxton*.

Under strict scrutiny, there is no question that Section 1 fails. Defendants do not argue otherwise, aside from a conclusory half-sentence. Defs.' Br. at 47; *see, e.g.*, *Koehler v. Brody*, 483 F.3d 590, 599 (8th Cir. 2007) (conclusory one-sentence argument is waived).

But even if the Court applied intermediate scrutiny, Section 1 would still fail. Under that standard, a statute only survives if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v.*

*FCC*, 520 U.S. 180, 189 (1997). As the district court found, Section 1 "regulates substantially more speech than the Constitution allows." Add. 12, App. 2109, R. Doc. 126, at 12. Because Section 1 fails either way, the Court may "assume without deciding" that the "less rigorous standard" applies. *Jacobsen v. Howard*, 109 F.3d 1268, 1272 (8th Cir. 1997).

### 2. Section 1 is overbroad.

The analytical framework for statutes regulating the display or availability of material that is harmful to minors but protected for adults was established in *Virginia II*. In *Virginia II*, the Supreme Court considered a law prohibiting "knowingly display[ing] [harmful-to-minors material] for commercial purpose in a manner whereby juveniles may examine and peruse" it. 484 U.S. at 386. The parties agreed that the statute was unconstitutional if it was "a broad enactment, potentially applying to a huge number of works," but Virginia argued "that the statute's coverage is much narrower." *Id.* at 393-94.

The Supreme Court refused to "accept [Virginia's] interpretation of the law as authoritative" and instead certified interpretive questions to the Virginia Supreme Court. *Id.* at 395-98. That court held the statute

was applicable only to books that were obscene even for older minors, was only violated if a minor actually read the book, and was satisfied by a bookseller's "reasonable efforts" to prevent perusal. *Virginia v. Am. Booksellers Ass'n, Inc.*, 372 S.E.2d 618, 623-25 (Va. 1988). The Fourth Circuit subsequently upheld the statute and the Supreme Court denied certiorari. *Am. Booksellers Ass'n, Inc. v. Virginia*, 882 F.2d 125, 127-28 (4th Cir. 1989), *cert denied*, 494 U.S. 1056 (1990).

Courts since *Virginia* have asked the same questions: is the statute limited to material obscene only for all minors, and what must booksellers or librarians do to avoid liability? *See, e.g.*, *Am. Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990) (finding display law constitutional where it "accommodate[d] the difference between older and younger minors in maturity levels" and was satisfied by using blinder racks); *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 525-27 (Tenn. 1993) (same); *Shipley v. Long*, 454 F. Supp. 2d 819 (E.D. Ark. 2004) ("*Shipley III*"). They also recognize the distinctive First Amendment danger posed by bans on display or availability, versus limits applied "at the point of *sale* [where] a bookseller can make an individualized determination as to the suitability of a specific item for a

specific child." *Virginia*, 484 U.S. at 390 n.5; *see, e.g.*, *Shipley III*, 454 F. Supp. 2d at 828; *Counts*, 295 F. Supp. 2d at 999.

Critically for this case, the Arkansas Supreme Court evaluated a narrower predecessor to Act 372 and concluded that it was *not* susceptible of the "narrowing interpretation" that saved the *Virginia* statute. *Shipley II*, 195 S.W.3d at 916-17. In 2003, Arkansas enacted a statute criminalizing "knowingly … [d]isplay[ing] material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed to view such material." *Id.* at 913. The Arkansas Supreme Court held that the statute prohibited displaying books that would be harmful to *any* minor, "even though not 'harmful' to an older child," *id.* at 917, and that books are "displayed … if they are simply shelved." *Id.* at 918. Relying on that conclusive interpretation, a federal district court enjoined the provision. *Shipley III*, 454 F. Supp. 2d at 824, 831. As that court explained, the statute "effectively stifles the access of adults and older minors to communications and material they are entitled to receive and view." *Id.* at 829-30.[5]

---

[5] Arkansas subsequently amended the "display" provision to cover only items where "[m]aterial harmful to minors is … contained on the front cover, back cover, or

*Shipley II* controls because Section 1 incorporates the same "harmful to minors" provision, alongside terms that are even broader than "display." *See Shipley II*, 195 S.W.3d at 915-16 (interpreting Ark. Code Ann. § 5-68-501); Ark. Code Ann. § 5-27-212(a)(1) ("'Harmful to minors' means the same as defined in § 5-68-501."). Under *Shipley II*'s interpretation, Section 1 can only be interpreted as criminalizing "knowingly … mak[ing] available" to *any* minor—even a 17-year-old— any book or other material that would be obscene only for the youngest minors.

Given that interpretation, the district court correctly concluded that compliance with Section 1 would require either "creating strict adults-only areas—into which would go potentially hundreds of books" or "shelv[ing] only books fit for young children and segregat[ing] or discard[ing] the rest." Add. 20-21; App. 1117-18; R. Doc. 126, at 20-21. Defendants do not argue that the statute, thus interpreted, is constitutional. Nor could they: states cannot "reduce the adult population … to reading only what is fit for children." *Butler*, 352 U.S. at 383.

---

binding"—*i.e.*, pornographic magazines and videos protected for adults but not for minors. Ark. Code Ann. § 5-68-502(a)(1)(B)(ii). This provision remains in effect.

Instead, Defendants attempt to narrow the statute the same way the Arkansas Supreme Court previously rejected. Defendants claim that "the crime requires a targeted action toward a minor, not an inadvertent or untargeted action (such as shelving a book …)." Defs.' Br. at 52. While this might be true of some of the statute's proscribed conduct (*e.g.*, "giv[ing]"), it is not a plausible reading of "makes available." Nor is it true of "shows," which, as Defendants' own definition confirms, broadly includes actions such as "offer for sale" or "permit to be seen." *Show*, MerriamWebster.com, Merriam-webster.com/dictionary/show (last visited Sep. 19, 2025). The ordinary meaning of these terms is indistinguishable from the Arkansas Supreme Court's construction of "display": "if 'material harmful to minors' is shelved on a bookshelf, even without some other effort made to draw attention to it, it is ["made available" or "shown"] within the meaning of the statute." *Shipley II*, 195 S.W.3d at 918. Interpreting the statute to *only* cover "knowingly act[ing] '[t]o equip,' 'supply,' or 'give' obscene material to a minor," Defs.' Br. at 52, improperly erases these words from the statute. *See Babbitt v. Sweet Home Chapter of Comtys. for a Great Or.*, 515 U.S. 687, 702 (1995)

34

(*noscitur a sociis* cannot give word "essentially the same function as other words in the definition, thereby denying it independent meaning").

Defendants' argument is further belied by the fact that Section 1 is *broader* than Arkansas's preexisting statute regulating display and provision to minors of material harmful to them. Ark. Code Ann. § 5-68-502. That statute makes it unlawful to "knowingly … [d]isplay" material whose cover is harmful to minors without a blinder rack, or "[s]ell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor" material that is harmful to minors. *Id.* § 5-68-502(a)(1)-(2). The legislature's conscious choice to include additional terms in Section 1—including "makes available" and "shows"—confirms that it intended those terms to have substance. *See United States v. Bean*, 537 U.S. 71, 76 n.4 (2002) ("The use of different terms within related statutes generally implies that different meanings were intended.") (citation omitted). Moreover, the preexisting statute's exemption of parents and identification of specific, objective compliance mechanisms show less sweeping ways to pursue Arkansas's interests.

Defendants rely heavily on Section 1's scienter requirement, ignoring that the unconstitutional "display" statute had the exact same

requirement. *See Shipley II*, 195 S.W.3d at 913. Under Arkansas law, a scienter requirement is satisfied if one "acts knowingly with respect to his conduct or the attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist." Ark. Code Ann. § 5-2-202(2). All that booksellers or librarians must "know" is that they made a book available to a minor, not that a minor accessed it. This distinguishes the portion of the prior statute that the *Shipley* courts upheld, which criminalized knowingly "sell[ing]" to a minor or "allow[ing] [a minor] to view" material. *See Shipley II*, 195 S.W.3d at 919; *Shipley III*, 454 F. Supp. 2d at 831.

Even if Section 1 were limited to "giv[ing]" books to minors, it would still be unconstitutional because "unlike Arkansas's prior iterations of this type of law," Section 1 contains no exception for parents providing books to their own children. Add. 7 n.3; App. 1104; R. Doc. 126, at 7 n.3; *compare* Ark. Code Ann. § 5-68-502(a)(2)(B); *cf. Ginsberg*, 390 U.S. at 640 (upholding statute that "does not bar parents who so desire from purchasing the [material] for their children"). It thus impairs parents' constitutional rights to direct their children's upbringing and education. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

Defendants make three other attempts to save Section 1 from scrutiny and overbreadth.[6] First, they offer *Upper Midwest Booksellers Association v. City of Minneapolis*, 780 F.2d 1389 (8th Cir. 1985), a pre-*Virginia* case upholding an ordinance requiring sealed wrappers for materials harmful to minors and opaque covers when a cover alone was harmful. But the statute in *Upper Midwest* only covered materials "on the borderline between pornography and artistic expression," *id.* at 1396 (quoting *Young v. Am. Mini Theatres*, 427 U.S. 50, 61 (1976)), which, as already discussed, is not the case here. As the district court observed, Section 1 "go[es] far beyond anything the Eighth Circuit approved in *Upper Midwest*." Add. 26; App. 1123; R. Doc. 126, at 26; *see also id.* at 19 (noting, *inter alia*, that *Upper Midwest* did not cover libraries and "gave clear direction to booksellers about how to comply with the law").

---

[6] Defendants submitted their brief before the Supreme Court issued *Paxton* and did not file a Rule 28(j) notice suggesting it is relevant. If they rely on it in reply, that argument would fail. *Paxton* dealt with a requirement that pornographic websites with material conceded to be "harmful to minors" use "established verification methods already in use," which "allow[] adults full access to the content in question." 145 S. Ct. at 2317-18. It does not suggest that Arkansas's repackaged display/availability law—which undisputed evidence shows will force many bookstores and libraries to stop carrying books protected for adults and to bar older minors from books protected for them—can survive scrutiny.

Defendants' reliance on *M.S. News Co. v. Casado*, 721 F.2d 1281 (10th Cir. 1983), similarly fails. There, the Tenth Circuit upheld a narrow "blinder-rack" ordinance specifying objective, minimally burdensome compliance measures and preserved adult access, unlike Section 1. *See id.* at 1286-88; Add. 16-17; App. 1113-14; R. Doc. 126, at 16-17 (distinguishing *M.S. News*).

Moreover, *Upper Midwest* and *M.S. News* pre-dated *Virginia* and *Shipley*. "Though the State would rather this Court ignore what happened after *Upper Midwest*, that bell cannot be unrung." *Id.* at 19; *accord Shipley III*, 454 F. Supp. 2d at 831.

Second, Defendants claim that the district court did not properly evaluate "whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (internal quotation omitted); *see* Defs.' Br. at 56-58. But that is exactly what the district court did. *See, e.g.*, Add. 20; App. 1117; R. Doc. 126, at 20 (comparing the unlawful "restrictions on older minors' and adults' access to vast amounts of reading material" to Section 1's effect in "protect[ing]

younger minors from accessing inappropriate sexual content in libraries and bookstores").

This is not a case like *NetChoice*, where courts considered how an Internet regulation applied to services as diverse as email providers, online marketplaces, payment services, and ride-sharing services. *See* 603 U.S. at 725. Section 1 regulates one subject: the content of books and similar materials. Ark. Code Ann. § 5-27-212(a)(4)(B). It explicitly *excludes* Internet material. *Id.* § 5-27-212(c). So it raises no complicated factual questions about widely disparate applications.

Defendants' other principal case, *United States v. Hansen*, 599 U.S. 762 (2023), illustrates the point. *Hansen* didn't analyze every communication that could fall within the statute, but looked broadly at whether the statutory terms "captur[ed] only a narrow band of speech" or instead "encompass[ed] a broader swath." *Id.* at 771. Neither *Hansen* nor *NetChoice* holds that a statute unlawfully sweeping in hundreds of protected books withstands challenge because the court did not count the individual books in bookstores' and libraries' collections that could lawfully be restricted. *See* Add. 10 n.4; App. 1107; R. Doc. 126, at 10 n.4 ("[Plaintiffs] have provided uncontroverted testimony regarding the

hundreds of books displayed in their collections and inventories that are likely to subject librarians and booksellers to prosecution under Section 1 … ."); *cf. NetChoice*, 603 U.S. at 723 ("In First Amendment cases … we have substituted a less demanding though still rigorous standard.").

That requirement is particularly inapt here, where Arkansas maintains another statute prohibiting "[s]elling, loaning, or displaying pornography to minors." Ark. Code Ann. § 5-68-502. The legitimate sweep of Section 1 that Defendants identify, Defs.' Br. 57, is already prohibited. Defendants have never identified any conduct Section 1 might legitimately prohibit that is not already covered.

Finally, Defendants claim that it is "fanciful" to fear Section 1 being applied against books that are protected for older minors and adults, citing *Romeo and Juliet*. Defs.' Br. at 57. But the Supreme Court routinely considers such applications in overbreadth challenges. In *Ashcroft v. Free Speech Coal.,* the Court specifically cited *Romeo and Juliet* as an example of the statute's overbreadth, reversing a district court that "dismissed [an] overbreadth claim because it was 'highly unlikely' that any 'adaptations of sexual works like *Romeo and Juliet* will be treated as criminal contraband.'" 535 U.S. 234, 243 (2002)(citation

modified); *id.* at 247. Moreover, Defendants' validated Plaintiffs' concerns with their silence in the proceedings below: Plaintiffs provided evidence, uncontroverted by Defendants, of hundreds of books in their collections likely to trigger prosecution. Add. 10 n.4; App. 1107; R. Doc. 126, at 10 n.4.

## B. Section 1 Is Unconstitutionally Vague

The district court correctly found Section 1 unconstitutionally vague under the Due Process Clause. "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968).

Where "the literal scope of [a] regulation is 'capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.'" *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308-09 (8th Cir. 1997). A criminal law may not "delegate[] basic policy matters to

[government officials] for resolution on an ad hoc and subjective basis."
*Id.* at 1310; *see also Duhe v. City of Little Rock*, 902 F.3d 858, 863 (8th
Cir. 2018) ("A state statute is unconstitutionally vague if it … 'encourages
arbitrary and discriminatory enforcement.'") (quoting *Hill v. Colorado*,
530 U.S. 703, 732 (2000)). A law is unconstitutionally vague if people
subject to the law or its enforcers will "necessarily guess at its meaning
and differ as to its application." *Stephenson*, 110 F.3d at 1308.

The district court correctly held that Section 1's conduct terms are
fatally vague. Add. 21-22; App. 1118-19; R. Doc. 126, at 21-22. Section 1
"fail[s] to define [its] pivotal term[s]," *Stephenson*, 110 F.3d at 1309, such
as "present," "show," and "make available." The definitions Defendants
proffer illustrate the problem: does a person "show" a book to a minor
whenever they "permit [it] to be seen," or only when they "point [it] out"?
Defs.' Br. at 52 n.8. An attorney familiar with *Shipley II* knows the
answer, as discussed above, but a statute must "provide notice to the
*ordinary person* of what is prohibited." *United States v. Kaylor*, 877 F.2d
658, 661 (8th Cir. 1989) (emphasis added). And the ordinary person will
be left with "grave uncertainty." *Johnson v. United States*, 576 U.S. 591,
597 (2015); *see also Reno*, 521 U.S. at 871–72.

Similarly, "Section 1 provides no clarity on what affirmative steps a bookseller or librarian must take to avoid a violation." Add. 22; App. 1119; R. Doc. 126, at 22. Instead, its "vague phrasing raises a host of questions" about how to comply." *City of Chicago v. Morales*, 527 U.S. 41, 59 (1999); *see* Add. 25-26; App. 1122-23; R. Doc. 126, at 25-26 n.7 (discussing wide range of possible compliance thresholds). Section 1 omitted the safe harbor accompanying Arkansas's prohibition against selling pornographic magazines and videos. Ark. Code Ann. § 5-68-502(a)(1)(B). Nor does it contain that statute's exception for parents. *Id.* § 5-68-502(a)(2)(B). All that a bookseller, librarian, or parent can know is that something other than what Arkansas has previously allowed is required; what suffices is a mystery.

Defendants have little response. *See* Defs.' Br. at 60-62. They claim that Plaintiffs are "quibbling" by focusing on ambiguous terms such as "makes available" and "shows." *Id.* at 61. But the fact that "some conduct … clearly falls within the provision's grasp" does not absolve vagueness. *Johnson*, 576 U.S. at 597. Otherwise, Defendants rely on the same arguments as in their overbreadth section, which fail for the same reasons.

## IV.   THE CHALLENGE PROVISION IS UNCONSTITUTIONAL

Section 5 allows challengers and censorious local officials to remove disfavored books from public libraries based on viewpoint without reference to obscenity standards. That violates the First and Fourteenth Amendments because it "empowers local elected officials to censor library books they feel are not 'appropriate' for citizens to read and allows (if not encourages) content- and viewpoint-based restrictions on protected speech without any compelling purpose." Add. 4; App. 1101; R. Doc. 126, at 4.

Defendants' counterarguments fail. They argue that decisions to remove books from public libraries are government speech and thus have no First Amendment significance. This Court has already rejected that very argument, *see GLBT Youth*, 114 F.4th at 667-68, yet Defendants do not grapple with the Court's reasoning. Their argument is inconsistent with Supreme Court precedent and has not been accepted by *any* court. Beyond this quixotic effort to upend settled law, Defendants offer only implausible statutory interpretations that they conceded below "appear nowhere in the text of the law." Suppl. App. 39, R. Doc. 53, at 39.

## A. The District Court Correctly Held That the Challenge Provision Violates the First and Fourteenth Amendments

### *1. The Challenge Provision is unconstitutionally vague.*

The district court correctly found Section 5 void for vagueness. *See* Add. 31-33; App. 1128-30; R. Doc. 126, at 31-33. While the vagueness standard outlined *supra* Part II.B is less rigorous outside the criminal context, "a proportionally greater level of scrutiny is required [where] the regulation reaches the exercise of free speech." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023) (quoting *Stephenson*, 110 F.3d at 1309).

Most fundamentally, "Section 5's pivotal term, 'appropriateness,' is susceptible to multiple interpretations and all but guarantees that the challenge process will result in the withdrawal or relocation of books based on their content or viewpoint." Add. 31; App. 1128; R. Doc. 126, at 31. It does not reference Arkansas's variable obscenity statute, despite the legislature incorporating that standard in Section 1. *See* Ark. Code Ann. § 5-27-212(b)(1). "Appropriateness" is thus not the carefully defined "harmful to minors" standard but rather a subjective mystery standard undefined anywhere in law. *See, e.g.*, *Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen Congress includes particular language in one

section of a statute but omits it in another … this Court presume[s] that Congress intended a difference in meaning.").

"When a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). As the district court explained, the ordinary definition of "appropriateness" is "the state of being suitable for a particular person, condition, occasion or place." Add. 32; App. 1129; R. Doc. 126, at 32 (quoting *Appropriate*, The American Heritage Dictionary (New College Ed. 1976)). Statutory terms cannot get much vaguer. Indeed, Defendant Keith, the Crawford County official tasked with "present[ing]" challenged books to the governing body under Section 5, "testified in his deposition that he did not know what 'appropriate' meant in the context of Section 5 but guessed it could mean 'different thing[s] for different people.'" Add. 32; App. 1129; R. Doc. 126, at 32 (quoting App. 908; R. Doc. 99-23, at 48:1-10).[7] The State Librarian similarly acknowledged that Section 5

---

[7] Defendants downplay Defendant Keith's concession by citing a redirect examination where defense counsel offered a "different interpretation of how the statute works" and asked his client to agree with it. App.914-16; R. Doc. 99-23, at 72:4-74:23; *see* Defs.' Br. at 45-46. The district court was not obligated to credit this attempt to rehabilitate testimony through leading questions over a candid response revealing how an official implementing the statute understands its vague terms.

contains "several terms that we (who are not attorneys!) don't quite know how to interpret." App. 890, R. Doc. 99-22, Exhibit 7, at 79.

Section 5 thus "fails to define the [key] term at all, and, consequently, fails to provide meaningful guidance for those who enforce it." *Stephenson*, 110 F.3d at 1310. Those who apply it will "necessarily guess at its meaning and differ as to its application," leading to "arbitrary and discriminatory enforcement." *Id.* at 1308. As the district court observed, this "lack of clarity seems to have been by design. After all, by keeping the pivotal terms vague, local governing bodies have greater flexibility to assess a given challenge however they please rather than how the Constitution dictates." Suppl. App. 39-40, R. Doc. 53, at 39-40. This is reinforced by Section 5's indication that officials may withdraw material based on "viewpoints expressed within the material," provided that is not the *sole* reason. Ark. Code. Ann. § 13-2-106(c)(7)(B)(i). The permissible role for viewpoint is left unaddressed, rendering the statute "fatally vague." *Stephenson*, 110 F.3d at 1310.

Section 5's vagueness does not end there. The statute uses both "withdraw" and "relocate," without defining when the library may withdraw a book and when it must instead relocate it. *See* Ark. Code.

Ann. § 13-2-106(c)(7)(B)(i). For relocations, it is even vaguer, lacking any guidance regarding what constitutes "an area that is not accessible to minors under eighteen … ." *Id.* § 13-2-106(c)(11)(A). With "no guidance" to librarians, the district court reasonably concluded that "the most restrictive of the options … is the one librarians are most likely to implement, burdening the most speech." Add. 26 n.7; App. 1123; R. Doc. 126, at 26 n.7. Libraries with tight budgets and small buildings will likely be forced to "withdraw" books altogether, given the burden of creating inaccessible areas. *See, e.g.*, App. 395, R. Doc. 99-3 at ¶¶ 15-16; App. 412-13, R. Doc. 99-5 at ¶ 14; App. 550, R. Doc. 99-17 at ¶ 18. Accordingly, patrons will be denied access to constitutionally protected material. Because the statute is not "clearly drawn" and its standards are not "reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application," *Interstate Circuit*, 390 U.S. at 689, it must be invalidated.

Defendants try rescuing Section 5 by grafting onto it definitions they developed for litigation purposes. *See* Suppl. App. 39, R. Doc. 53, at 39 ("[T]he State conceded … such explanations … simply represent the State's 'best construction' of the statute's plainly ambiguous terms."). The

district court rightly rejected these atextual interpretations. *Id.* 39-40. They principally argue that "appropriateness" refers to "whether the challenged material is consistent with the public library's selection criteria, especially as it relates to material that is suitable for children." Defs.' Br. at 44. But Section 5 "does *not* require the quorum court or city council members to adopt—or even be provided a copy of—the library's selection criteria, nor does it require them to read or consider the criteria." Add. 25; App. 1122; R. Doc. 126, at 25. Defendants' attempt to tie Section 5 to "material that is suitable for children," Defs.' Br. at 44, also fails because the legislature chose against incorporating the "harmful to minors" obscenity standard, as discussed above.

Defendants' narrowing constructions thus do not constrain the "unfettered discretion" that Section 5 grants government actors. *Stephenson*, 110 F.3d at 1310. The only certainty is that "any book, even one written for an adult reader, could be deemed 'inappropriate'" under Section 5, leaving patrons' access to speech at the government's whims. Add. 31; App. 1128; R. Doc. 126, at 31. The district court correctly found that this "fails the 'stringent vagueness test' that applies to a law that interferes with access to free speech." Add. 33; App. 1130; R. Doc. 126, at

33 (quoting *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 689-90 (8th Cir. 1992)).

### 2. The Challenge Provision enables unlawful content-based restrictions.

Section 5 is also "unconstitutional because it unnecessarily imposes content-based restrictions on protected speech." Add. 33; App. 1130; R. Doc. 126, at 33. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens on speech because of its content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

Section 5's chief purpose is empowering government officials to make content-based decisions: "evaluators must consider the content of the library material to screen for 'appropriateness' before deciding whether the public should be deprived access to the material." Add. 33-34; App. 1130-31; R. Doc. 126, at 33-34. Thus, every removal under Section 5 will be "a content-based restriction on otherwise constitutional

speech—unless the challenged book met the legal definition of obscenity, which city governments are not required to consider." *Id.* The district court correctly found that this content-based law is not narrowly tailored to serve compelling state interests. Add. 33-35; App. 1130-32; R. Doc. 126, at 33-35.

In district court, Defendants did not argue that Section 5 was narrowly tailored to serve a compelling state interest. They have thus waived that argument on appeal. *See, e.g., N. Bottling Co. v. PepsiCo, Inc.*, 5 F.4th 917, 922 (8th Cir. 2021).

Even if the Court were to reach Defendants' belated narrow-tailoring argument, it would fail. Defendants' principal asserted interest is "protecting minors." Defs.' Br. at 42. But Section 5's drafters did not limit the government to removing books that are obscene for minors under Arkansas's variable obscenity statute. *See supra* 43-44. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213-14. Additionally, as with Section 1, *see supra* 34-38, even if Section 5 were limited to speech that is statutorily harmful to minors,

it still is not narrowly tailored because it would "sweep in materials that are constitutionally protected as to older minors and adults and place unjustified burdens on their access." Add. 35; App. 1132; R. Doc. 126, at 35.

Defendants also assert "interests in increasing transparency … and making local governments more accountable." Defs.' Br. at 42. That rationale does not explain the novel and malleable "appropriateness" standard. Defendants' belated argument that Section 5 is "the least restrictive means for the State to achieve its goals," Defs.' Br. at 43, would thus be meritless even if properly before the Court.

Defendants also argue that the only content-based restrictions are individual libraries' underlying policies, not Section 5. Defs.' Br. at 38-39. This argument fails because it relies wholly on Defendants' implausible interpretation of "appropriate," rebutted *supra* Part III.A. Their claim that "public libraries are the ones making the curation decisions," Defs.' Br. at 38 n.6, similarly ignores Section 5's appointment of governing bodies—not libraries—as the final word on content-based determinations of whether books are "appropriate" to remain in the library. *See* Ark. Code Ann. § 13-2-106(c)(12)(A).

### 3. The Challenge Provision discriminates on the basis of viewpoint and is a prior restraint.

Beyond the two substantive constitutional defects that led the district court to enjoin Section 5, Plaintiffs identified two additional flaws that the district court did not reach. *See* App. 358, R. Doc. 99, at 2. This Court "may affirm a judgment on any ground raised in the district court." *Transcontinental Ins. Co. v. W.G. Samuels Co.*, 370 F.3d 755, 758 (8th Cir. 2004).

First, Section 5 discriminates based on viewpoint by providing extensive rights to individuals opposing books in a library's collection, while affording no rights to individuals supporting them. Those urging withdrawal have a right to file a formal challenge, meet with the library, and make their case to the local government if their challenge fails. *See* Ark. Code Ann. § 13-2-106(c)(1), (3), (5), (12). Anyone with the opposing view has no such rights. They lack even an opportunity to comment, much less appeal a withdrawal. The government may not "discriminate based on the viewpoint of private persons whose speech it facilitates." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). But that is what Section 5's one-sided culling procedure does.

Second, Section 5 imposes a prior restraint on protected materials without providing for judicial review. Laws facilitating censorship of protected speech must produce a decision "within a specified brief period" and provide for "prompt judicial review" of decisions abridging that speech. *Freedman v. State of Maryland*, 380 U.S. 51, 55, 59 (1965). Section 5 provides no path for judicial review, prompt or otherwise, when a library or governing body removes a book. Nor must a library's review committee decide within a brief period; Section 5 sets no time limit, and the library may make the challenged material unavailable "throughout the challenge process." Ark. Code Ann. § 13-2-106(c)(2).

## B. Library Collection Decisions Are Not Government Speech

Defendants' main argument is not that Section 5 survives First Amendment and due process scrutiny, but that it is exempt from the First Amendment altogether as "government speech." Defs.' Br. at 28. This Court has already rejected that argument. *GLBT Youth*, 114 F.4th at 667-68. And even beyond *GLBT Youth*, courts—including the Supreme Court—have universally rejected Defendants' argument.

### 1. Eighth Circuit and Supreme Court opinions show that library collection decisions are not government speech.

*GLBT Youth* considered a challenge to "regulations regarding books in Iowa's public school libraries." 114 F.4th at 665. Iowa argued that "the removal of books from public school libraries constitutes government speech." *Id.* at 667. The Court disagreed. *Id.* Applying the *Shurtleff* factors (discussed *infra* Part III.B.2), it found that none of the factors supported the proposition that "the placement and removal of books in public school libraries [is] the government speaking." *Id.* at 668. As the Court explained, if every "book[] on the shelf of public school libraries constitutes government speech, the State "is babbling prodigiously and incoherently." *Id.* at 668 (quoting *Matal v. Tam*, 582 U.S. 218, 234 (2017)).

Combining this analysis with "the [Supreme] Court's directive to 'exercise great caution before extending [its] government-speech precedents,'" *id.* (quoting *Matal*, 582 U.S. at 235), the Court found that the plaintiffs had standing for their First Amendment claim regarding the library regulations. It then remanded the district court's preliminary injunction to apply *NetChoice*'s overbreadth standard. *Id.* at 669-70. But critically, it suggested only that the regulations might *survive* First

Amendment scrutiny, not that they might be *exempt* from it under the government speech doctrine. *Id.*

Defendants rebut none of this Court's analysis, *see* Defs.' Br. at 35-36, because the Court got it right. Instead of addressing its reasoning, they dismiss it as a mere standing analysis. But *GLBT Youth*'s merits analysis would be nonsensical if the Court considered the government speech argument a live issue. The *GLBT Youth* defendants, like Defendants here, made government speech the centerpiece of their *merits* argument, not just their standing argument. *See* Br. of State Defs.-Appellants, *GLBT Youth*, No. 24-1075 (8th Cir. Mar. 8, 2024), ECF No. 35-49. It is non-sensical to suggest that when the Court resolved the government speech argument in the standing analysis and then remanded on an issue that would be irrelevant if library collections were government speech, it was actually leaving that central question open.[8]

Defendants similarly dismiss the Supreme Court's opinions in *Board of Education, Island Trees Union Free School District No. 26 v.*

---

[8] Unlike Defendants here, the *GLBT Youth* defendants recognized that this Court foreclosed their government speech argument, abandoning that argument on remand. *See* State Defs.' Resistance to Pls. Renewed Mot. for Prelim. Inj., *Iowa Safe Schs. v. Reynolds*, No. 4:23-cv-474 (S.D. Iowa Dec. 3, 2024), ECF No. 128.

*Pico*, 457 U.S. 853 (1982), without confronting their reasoning. But while *Pico* lacks a binding holding, its "persuasive value" still must be considered. *Walls v. Sanders*, 144 F.4th 995, 1004 (8th Cir. 2025); *see also, e.g.*, *Redner v. Dean*, 29 F.3d 1495, 1499 (11th Cir. 1994) ("When faced with a fragmented Court, we may distill the various opinions down to their narrowest grounds of concurrence to derive any binding precedent.").

*Pico*'s persuasive value—which Defendants have not disputed—is considerable. At least seven Justices agreed that school boards' "discretion to determine the content of their school libraries … may not be exercised in a narrowly partisan or political manner." *Pico*, 457 U.S. at 870 (Brennan, J., plurality op.). The lead dissent "cheerfully concede[d] all of this." *Id.* at 907 (Rehnquist, J., dissenting). Even Justice White recognized that "the reason or reasons underlying the school board's removal of the books" was a critical factual issue, which would be impossible if public libraries could remove books for any reason whatsoever. *Id.* at 883 (White, J., concurring); *see also Little v. Llano County*, 138 F.4th 834, 877-79 (5th Cir. 2025) (en banc) (Higginson, J.,

dissenting) (discussing *Pico*).[9] This consensus is fatal to Defendants' government speech argument, which posits that public libraries can employ viewpoint discrimination however they please.

One final point on *GLBT Youth* and *Pico* bears mention. Both cases deal with *school* libraries, not public libraries. This case involves public libraries designed for people of all ages to conduct "freewheeling inquiry," *Pico*, 457 U.S. at 915 (Rehnquist, J., dissenting). The First Amendment values at stake are therefore even more salient than in *GLBT Youth* and *Pico*—and the corresponding governmental interest in suppressing ideas far lower. *See Little*, 138 F.4th at 884 & n.15 (Higginson, J., dissenting).

> ### 2. Section 5's removal regime is not government speech under *Shurtleff*.

As noted above, *GLBT Youth* concluded that "the placement and removal" of books on library shelves is not government speech by applying the three-factor test of *Shurtleff v. Boston*, 596 U.S. 243 (2022). *See GLBT Youth*, 114 F.4th at 667-68. Defendants' attempt to relitigate that issue here is unpersuasive.

---

[9] Defendants rely on the Fifth Circuit's en banc decision in *Little* to dismiss *Pico*. Defs.' Br. at 36-37. But as discussed below, *infra* at 64, they ignore that a majority of the Fifth Circuit *rejected* Defendants' government speech argument. *See Little*, 138 F.4th at 835 n.†; *see also id.* at 881 n.14 (Higginson, J., dissenting).

In *Shurtleff*, the Supreme Court considered city-owned flagpoles outside Boston City Hall. Typically, the city flew governmental flags, but when private groups held events on City Hall Plaza it allowed them to fly their own flags. 596 U.S. at 249-50. Boston denied a Christian group's request to fly its flag, defending that discrimination on the theory that its choice of what flags to fly was government speech, allowing it to "refuse flags based on viewpoint." *Id.* at 251.

The Supreme Court recognized that the boundary between "government-public engagement transmit[ting] the government's own message" and "a forum for the expression of private speakers' views" "can blur." *Id.* at 252. Determining where a program falls is a "holistic inquiry" involving "several types of evidence … including: the history of the expression at issue; the public's likely perception as to who is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* This review "is not mechanical" and "is driven by a case's context rather than the rote application of rigid factors." *Id.* It is insufficient to look to "general history" (e.g., "the history of flag flying, particularly at the seat of government"), but rather requires examining "the details of *this* flag-flying program." *Id.* at 253, 255.

Applying this test, the Court found that Boston's flag-flying program was not government speech, noting, *inter alia*, that "even if the public would ordinarily associate a flag's message with Boston, that is not necessarily true for the flags at issue here." *Id.* at 255. While some of the flags apparently reflected governmental messages, "it is more difficult to discern a connection to the city as to, say, … a ceremony by a local community bank." *Id.* at 256.

Justice Alito, joined by Justices Thomas and Gorsuch, concurred, emphasizing that "courts must be very careful when a government claims that speech by one or more private speakers is actually government speech," because it might be "using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint.'" *Id.* at 263 (Alito, J., concurring) (internal quotations omitted). He drew a clear line between "whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the 'regulation of private speech.'" *Id.* (Alito, J., concurring) (quoting *Summum*, 555 U.S. at 467).

Under Justice Alito's formulation, "government speech occurs if— but only if—a government purposefully expresses a message of its own

through persons authorized to speak on its behalf, and in doing so, does not rely on a means that abridges private speech." *Id.* at 267. Put simply, "the government-speech doctrine does not extend to private-party speech that is merely subsidized or otherwise facilitated by the government." *Id.* at 271.

Under either of these tests, Defendants' arguments fail. On Justice Alito's understanding, they fail at the outset because the "relevant act of communication" is not "government action" but private speakers' action. *Id.* at 268. The majority's holistic inquiry reaches the same result, as this Court found in *GLBT Youth*, 114 F.4th at 667-68.

The history of the expression at issue. Defendants' only discussion of history is one paragraph summarizing the general history of library curation. Defs.' Br. at 32. But the relevant facts are "the details of *this* … program," not merely "general history." *Shurtleff*, 596 U.S. at 253, 255. Those details weigh heavily against Defendants. As in *GLBT Youth*, "historically the government of [Arkansas] has not asserted extensive control over removing books from public … libraries." 114 F.4th at 668. This case's record lacks any evidence that state or local governments

have historically exercised meaningful control over public libraries' contents.

In *Shurtleff*, the question was not the city's flag-flying in general but its practice of allowing private groups to occasionally fly their own flags. *See, e.g.*, 596 U.S. at 255. In *United States v. American Library Association*, the question was specifically how libraries provided Internet access. *See, e.g.*, 539 U.S. 194, 214-15 (2003) (Kennedy J., concurring); *see also, e.g.*, *Summum*, 555 U.S. at 464 (recognizing that some expressive acts in public parks are private speech, and others governmental speech). Here, no evidence exists of *any* history of political control over libraries' book removal decisions, in Arkansas or elsewhere.

Even if general history alone sufficed, Defendants' reliance on the plurality opinion in *American Library Association* is infirm. Like *Pico*, *American Library Association* was a fractured decision. The narrowest opinion, and thus the controlling one, is Justice Kennedy's concurring opinion, not the plurality that Defendants repeatedly cite. *See Am. Libr. Ass'n*, 539 U.S. at 214-15 (Kennedy, J., concurring); *All. for Open Soc'y Int'l, Inc. v. USAID*, 430 F. Supp. 2d 222, 264 n.33 (S.D.N.Y. 2006) ("Justice Kennedy's opinion, as the narrowest majority view, is

considered the controlling opinion."). And Justice Kennedy upheld the challenged statute *not* because it regulated government speech but because plaintiffs had not shown "that adult library users' First Amendment right to access protected material would be burdened 'in any significant degree.'" *Alliance for Open Soc'y*, 430 F. Supp. 2d at 264 (quoting *Am. Libr. Ass'n*, 539 U.S. at 214 (Kennedy, J., concurring)). Justice Kennedy recognized that an as-applied challenge might be available under the First Amendment, which would not be the case if library collections constituted government speech. *Am. Libr. Ass'n.*, 539 U.S. at 215 (Kennedy, J., concurring). So did four other Justices. *Id.* at 216 (Breyer, J., concurring); *id.* at 220 (Stevens, J., concurring); *id.* at 231 (Souter, J., concurring, joined by Ginsburg, J.).

The public's likely perception of who is speaking. As *GLBT Youth* found, "it is doubtful that the public would view the placement and removal of books in public … libraries as the government speaking." 114 F.4th at 668. "[I]f placing these books on the shelf … constitutes government speech, the State 'is babbling prodigiously and incoherently.'" *Id.* (quoting *Matal*, 582 U.S. at 236).

Consider *Fifty Shades of Grey*, a book that "a library would not think of excluding." *Little*, 138 F.4th at 837 (op. of Duncan, J.); *see, e.g.*, App. 841, R. Doc. 99-22 at 114:8-24 (former head Crawford County librarian noting demand for the book). The suggestion that the public would perceive *Fifty Shades of Grey*'s message as the government's message strains credulity. *See Shurtleff*, 596 U.S. at 255 ("[E]ven if the public would ordinarily associate a flag's message with Boston, that is not necessarily true for the flags at issue here."). Even Defendants' suggestion that "[t]he government is saying that the material … has some educational or literary value," Defs.' Br. at 32, cannot be taken seriously. Just as Boston raising the flag of a local bank did not communicate the city's views, *Shurtleff,* 596 U.S. at 256, a library carrying a particular book does not communicate the local government's views. *See also id.* at 268 (Alito, J., concurring) ("For 'speech' to be spoken by the government, the relevant act of communication must be government action.").

The record lacks any evidence that anybody perceives a book's presence in the library's collection as communicating *anything* about the government's views.

The extent to which the government has actively shaped or controlled the expression. The third factor similarly supports Plaintiffs. "[H]istorically the government of [Arkansas] has not asserted extensive control over removing books from public … libraries." *GLBT Youth*, 114 F.4th at 668. Defendants analogize public library collections to a public park's monuments, which *Summum* found to be government speech. Defs.' Br. at 33. The closer analogy is public speakers in a park: a "situation[] in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." *Summum*, 555 U.S. at 478.

Defendants note that library books are typically purchased with state funds, but government funding does not connote government speech. *See, e.g., Bd. of Regents of Univ. of Wisc. Sys. v. Southworth*, 529 U.S. 217, 229-30 (2000). A government program accommodating multitudes of speakers might need to consider how to limit speech as it approaches capacity, but that is no license for unlimited viewpoint discrimination.

For these reasons, "no court, anywhere in the country, has ever held that the government's decision to remove books from a public library constitutes government speech"—so much so that it was "unsurprising" for "a majority of" the Fifth Circuit to join the Eighth in "firmly reject[ing]" Defendants' argument. *Little*, 138 F.4th at 881 n.14 (Higginson, J., dissenting) (citing *GLBT Youth*, 114 F.4th at 667-68)). Rather, as the *Pico* dissenters "cheerfully concede[d]," such decisions "may not be exercised in a narrowly partisan or political manner." *Pico*, 457 U.S. at 907 (Rehnquist, J., dissenting). "To prevent the government-speech doctrine from being used as a cover for censorship," *Shurtleff*, 596 U.S. at 263 (Alito, J., concurring), Defendants' argument must be rejected.

## V. THE INJUNCTION WAS NOT AN ABUSE OF DISCRETION

Defendants ask the Court to narrow the injunction's scope. Defs.' Br. at 62-64. This Court reviews a permanent injunction for abuse of discretion, *see, e.g.*, *FTC v. Am. Screening, LLC*, 105 F.4th 1098, 1105 (8th Cir. 2024), a standard Defendants ignore and cannot satisfy.

Defendants did not raise any arguments about scope in district court, nor move the court to amend the injunction after it issued. They

have therefore waived their arguments. *See Warner Bros. Entmt., Inc. v. X One X Prods.*, 840 F.3d 971, 981 (8th Cir. 2016).

In any case, the arguments are meritless. Defendants ask the Court to rewrite Section 1 to strip individual words. But that would not cure the unconstitutional imposition on older minors' access to protected speech and parents' right to direct their children's upbringing and education nor the vagueness of booksellers' and librarians' compliance obligations. Moreover, the provisions of Section 1 "are mutually connected and interwoven, [so] severance is not appropriate." *U.S. Term Limits, Inc. v. Hill*, 872 S.W.2d 349, 358 (Ark. 1994).

Defendants also ask the Court to revive one paragraph of Section 5, requiring libraries to have written curation policies. Ark. Code Ann. § 13-2-106(a). Plaintiffs have no objection to this paragraph, but severability is "a question of legislative intent," *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984). It is unlikely that the legislature intended that single paragraph to stand alone. Certainly, the district court did not abuse its discretion in declining that unusual approach.

Finally, Defendants request exempting some individual Defendants from the injunction. As explained *supra* 19-21, this argument fails.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's decision.

Respectfully submitted,

_/s/ John T. Adams_

David M. Fuqua
John T. Adams
Attorneys for Central Arkansas Library System, Nate Coulter, and the Eureka Springs Carnegie Public Library
FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202
(501) 374-0200
dfuqua@fc-lawyers.com
jadams@fc-lawyers.com

Bettina Brownstein
BETTINA E. BROWNSTEIN LAW FIRM
John C. Williams
ARK. CIVIL LIBERTIES UNION FDN.
Attorneys for Leta Caplinger, Olivia Farrell, Miel Partain, and Madeline Partain
904 West 2nd Street, Suite 2
Little Rock, AR 72201
(501) 920-1764
bettinabrownstein@gmail.com
john@acluarkansas.org
On Behalf of the Arkansas Civil Liberties Union Foundation, Inc.

Vincent O. Chadick
Brandon B. Cate
Glenn V. Larkin
Attorneys for Fayetteville Public Library
QUATTLEBAUM, GROOMS & TULL PLLC
4100 Corporate Center Drive, Suite 310
Springdale, Arkansas 72762
Telephone: (479) 444-5200
bcate@qgtlaw.com
vchadick@qgtlaw.com
glarkin@qgtlaw.com

Rebecca Hughes Parker
Harrison Rosenthal
Attorneys for Pearl's Books, LLC, Wordsworth Community Bookstore LLC, American Booksellers Association, Association of American Publishers, Inc., Authors Guild, Inc. Comic Book Legal Defense Fund, and Freedom to Read Foundation
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 768-6700
rebeccahughes.parker@dentons.com
harrison.rosenthal@dentons.com

Victoria S. Nugent
Jeff B. Dubner
Orlando Economos
Will Bardwell
Aman George
Attorneys for the Arkansas Library
Association, Advocates for All
Arkansas Libraries, and Adam
Webb, in his individual capacity
DEMOCRACY FORWARD FDN.
P.O. Box 34554
Washington, DC 20043
(202) 448-9090
vnugent@democracyforward.org
oeconomos@democracyforward.org
wbardwell@democracyforward.org
ageorge@democracyforward.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Eighth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ John T. Adams*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,000 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

3. This document has been scanned for viruses and is virus-free.

*/s/ John T. Adams*